IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

```
SHERRY ANNE BAILEY-POTTS,   )
                            )
    Plaintiff,              )
                            )
                            )     CIVIL ACTION NO.
    v.                      )       3:11cv495-MHT
                            )           (WO)
ALABAMA DEPARTMENT OF       )
PUBLIC SAFETY,              )
                            )
    Defendant.              )
```

OPINION

Plaintiff Sherry Anne Bailey-Potts ("Bailey-Potts") brings this lawsuit against defendant Alabama Department of Public Safety ("DPS"), claiming that DPS discriminated against her because of her race when it failed to promote her to the position of Driver License Examiner II. Bailey-Potts asserts this claim pursuant to Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. §§ 1981a, 2000e to 2000e-17) ("Title VII") and the Civil Rights Act of 1866 (42 U.S.C. § 1981) ("§ 1981"). Jurisdiction is proper under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights).

DPS moves for summary judgment. For the reasons that follow, the motion will be granted.

## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II. BACKGROUND

Bailey-Potts, an African-American female, has been a Driver License Examiner I since September 2000. She works in the DPS Phenix City office. Lieutenant Craig Ledyard, an African-American male, was the district commander for the office.

In May 2010, Bailey-Potts received a notice that she was on a list of eligible candidates for promotion to Driver License Examiner II, a supervisory position. She confirmed her interest in this position. At the time, she was listed in "Band 1" and ranked first on the register of eligible candidates. Ala. Hiring List (Doc. No. 22-4) at 2.

The Alabama State Personnel Department website provides the following explanation for "banded scoring":

> "One important purpose of testing is to identify the differences in test scores that reflect real differences among candidates. Banded scoring is a statistical procedure for grouping test scores that statistically are not meaningfully different from one another. In banded scoring, bands are set objectively and mathematically. The people in a band are similar to each other in that statistically there is no meaningful difference in their scores."

Ala. Website (Doc. No. 22-5) at 7.

In August 2010, Bailey-Potts received an email confirming her interest in the promotion and, in late October 2010, was informed she would be interviewed for

3

the promotion.  The only other applicant for the position was Debra Wingate, a white female.  Wingate had served as a Driver License Examiner I since May 2007 and was in "Band 2" and was ranked third amongst eligible candidates. Ala. Hiring List (Doc. No. 22-4) at 2.

Throughout 2010, DPS utilized a three-person panel for promotions. In this case, both Bailey-Potts and Wingate were interviewed by Terry Tate (white), Guy Rush (white), and Ledyard (black).  Ledyard substituted for a white panelist who was sick.  The interviews were conducted by asking the applicants how they would respond to a series of eight scenarios.  The panel split two to one, with Tate and Rush voting for Wingate and Ledyard voting for Bailey-Potts.

In November 2010, Ledyard called Bailey-Potts to inform her that she was not promoted. During the call, he told her that he was furious and that he had voted for her.  The apparent disagreement on the panel was over the way Bailey-Potts and Wingate approached their jobs.

4

Bailey-Potts tended to believe that the "customer could be wrong" about his or her complaint; by contrast, Wingate sought to appease the customer quickly and believed that many customer-service problems stemmed from the state employee.  DPS also contends that Wingate's answers were more detailed and that she was more likely to investigate a matter before taking adverse action against a customer or employee.

Bailey-Potts alleges that, in early 2011, a co-worker informed her that DPS did not "want anybody else black" in a supervisory position.  Bailey-Potts's Opposition Brief (Doc. No. 21) at 9.  Bailey-Potts states in her brief that this statement was made by Ledyard, the supervisor who dissented during the hiring panel.  Id.  But, as DPS points out, Bailey-Potts's deposition makes clear that it was another employee, Sergeant Jessie Williams, who made the comment.  Bailey-Potts Deposition (Doc. No. 22-2) at 5-6 ("Q: Sherry, you were asked about what caused you to think that they were looking for a white instead of an

African/American in the Opelika office. Was there any other reason that you didn't give that made you think that?  A: Well, <u>after I had discussed it with Sergeant Williams</u>--and, of course, I didn't say very much to anybody what I had done--he was just of the consensus--he said they just didn't want anybody else black.  There was enough of us.") (emphasis added).*  Significantly, Williams was not on the hiring panel, though he had recommended Bailey-Potts for promotion.

Bailey-Potts also contends that DPS failed to abide by an "affirmative-action" policy known as the "Rule of Ten." She states that the Rule of Ten prohibits DPS from passing over a qualified minority candidate in favor of a white applicant in a lower band.  According to the Alabama State Personnel Department's website, however, the "Rule of Ten" refers to "the certification of the top ten eligible job candidates (including the names of those with tied scores)

---

*In her opposition to DPS's motion to strike, Bailey-Potts acknowledged that Williams, not Ledyard, made this comment.

6

to the requesting agency." Ala. Website (Doc. No. 22-5) at 7. The rule provides that: "When a hiring agency requests a register from the State Personnel Department, the Rule of Ten is utilized to provide them with a list of the most qualified (highest scoring) candidates. If more than one vacancy is being filled, the name of one additional eligible candidate will be certified to fill each additional vacancy." Id. The State of Alabama's website makes no mention of an affirmative-action component to the Rule of Ten; rather, the rule functions as a cap on the number of applicants that the hiring agency may consider.

### III.   DISCUSSION

Both Title VII and § 1981 "have the same requirements of proof and use the same analytical framework." Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). This case, therefore, is governed by the familiar burden-shifting analysis of McDonnell Douglas Corp. v.

7

Green, 411 U.S. 792 (1973). Under the McDonnell Douglas framework, an employee has the initial burden of establishing a prima-facie case of unlawful employment discrimination by a preponderance of evidence. Id. at 802.

If the employkee establishes a prima-facie case, the burden then shifts to the employer to rebut the presumption by articulating a legitimate non-discriminatory reason for its action. The employer has a burden of production, not of persuasion, and thus need not convince the court that the reason advanced actually motivated its action. Id.

Once the employer satisfies this burden, "the presumption of discrimination is eliminated and the [employee] has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse

employment decision." Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000). In other words, an employee must show that an employer's proffered explanation is a mere pretext for discriminatory conduct.

DPS contends that Bailey-Potts has failed to meet her burden at the first and third stages of the McDonnell Douglas framework.

Bailey-Potts may establish a prima-facie case of failure to promote by establishing that: (1) she is a member of a protected class; (2) she was qualified and applied for the position; (3) she suffered an adverse-employment action; and (4) an equally or less qualified employee who was not a member of the protected class was promoted. Combs v. Plantation Patterns, 106 F.3d 1519, 1539 n.11 (11th Cir. 1997). Here, it is undisputed that Bailey-Potts satisfies the first three factors.

DPS contends that Wingate was a more qualified candidate and, therefore, Bailey-Potts cannot establish her prima-facie case. DPS notes that two of the panel

9

members rated Wingate more qualified because of her answers to their questions; hence, the panel promoted Wingate.

Bailey-Potts responds that she was ranked higher than Wingate prior to the interview, scoring in Band 1 and placing first in the list of eligible applicants. Additionally, Bailey-Potts had approximately a decade of experience compared to Wingate's three-and-a-half years.

"[T]he question whether the plaintiff in a disparate-treatment discrimination suit actually made out a prima facie case is almost always irrelevant when the district court considers an employer's motion for summary judgment or judgment as a matter of law." Brady v. Office of Sergeant at Arms, 520 F.3d 490, 492 (D.C. Cir. 2008); see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993) ("If ... the defendant has succeeded in carrying its burden of production, the McDonnell Douglas framework--with its presumptions and burdens--is no longer relevant. ... The presumption, having fulfilled its role

10

of forcing the defendant to come forward with some response, simply drops out of the picture."); Shuford v. Alabama State Bd. of Educ., 978 F.Supp. 1008, 1017 (M.D. Ala. 1997) (Thompson, J.) ("However, where, as in this case, the court has sufficient evidence to determine whether an employee has been a victim of discrimination, the court need not go through the McDonnell Douglas burden-shifting process and should instead reach the ultimate issue of discrimination."). Under the McDonnell Douglas framework, the burden at the first two steps is light for both the plaintiff and the defendant-employer. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) ("The burden of establishing a prima facie case of disparate treatment is not onerous."); Perryman v. Johnson Products Co., Inc., 698 F.2d 1138, 1143 (11th Cir. 1983) (noting that "the defendant's burden of rebuttal is exceedingly light").

In most cases, the real question lies in whether the employer's legitimate non-discriminatory reason is

11

pretextual. Given this reality in a "Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not ... decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas. Rather, in considering an employer's motion for summary judgment or judgment as a matter of law in those circumstances, the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race ... ?" Brady, 520 F.3d at 494. It is to this question that the court now turns.

As discussed above, DPS submits that its legitimate non-discriminatory reasons for promoting Wingate were her interview answers were more complete and she displayed an

attitude toward customer-service and other employees that was more in accordance with the supervisory role of a Driver License Examiner II. As such, DPS has satisfied its burden of production, and the court thus turns to the ultimate issue of race discrimination.

There must be "a strong showing of a disparity in qualifications in order for an inference of discrimination to arise." Denney v. City of Albany, 247 F.3d 1172, 1187 (11th Cir. 2001). An employer "may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons." Combs, 106 F.3d at 1543.

Bailey-Potts contends that DPS's rationales are a pretext for two reasons. First, Bailey-Potts points to her co-worker's comment that the DPS "didn't want anybody else black" as direct evidence of discrimination; but, as explained above and contrary to Bailey-Potts's brief, this statement was not made by a member of the hiring committee but rather by a co-worker who had recommended Bailey-Potts

13

for promotion. "[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." Standard, 161 F.3d at 1330. Bailey-Potts also implies that Ledyard feared retaliation and, therefore, failed to condemn the hiring panel's decision during his deposition; but, as Ledyard's deposition makes clear, he felt uncomfortable discussing hiring practices in law-enforcement positions and that his unease in making comments was "not necessarily with Wingate and Potts." Ledyard Deposition (Doc. No. 22-10) at 12.

Second, Bailey-Potts argues that DPS deviated from established practice in using interview panels. Bailey-Potts further notes that the panel split along racial lines and that the subjective-interview process improperly trumped her higher ranking. But, as Chief Examiner Guy Rush's affidavit explains, interview panels were used for several promotions in 2010. Additionally, the real dispute on the hiring panel was over how a supervisor

14

should interact with subordinates and the public. "[T]he fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext under Title VII." Denney, 247 F.3d at 1185. There is no evidence that DPS's implementation of an interview panel for Bailey-Potts's hiring was either aberrational or a ruse for discriminatory intent.

Bailey-Potts also argues that the Rule of Ten was not followed. There is no evidence to support this contention; moreover, the rule is not an affirmative-action policy. See Ala. Website (Doc. No. 22-5) at 7. Once again, Bailey-Potts's deposition cuts against her brief by explaining that the banded-score policy replaced an older version of the rule, which was an affirmative-action policy. Bailey-Potts Deposition (Doc. No. 22-2) at 13-14. Indeed, it appears that Bailey-Pott's counsel is confusing the Rule of Ten with a court-imposed "no-bypass rule," dating back to 1970, which prohibited Alabama state officials from bypassing a higher-ranked African-American

15

applicant in favor of a lower-ranked white applicant.  In 2006, this court terminated the Alabama's use of the no-bypass rule.  <u>United States v. Flowers</u>, 444 F. Supp. 2d 1192 (M.D. Ala. 2006) (Thompson, J.).

Bailey-Potts and Wingate were both on the Alabama Personnel Department's certification of eligible candidates for the promotion and were the only two applicants for this promotion.  While Bailey-Potts had more experience and was ranked first before the interview, the three-member panel concluded that Wingate was the more qualified candidate because of her answers to the interview questions.  Bailey-Potts has failed to introduce sufficient evidence to raise a genuine dispute of material fact that DPS's proffered explanations are a pretext for racial discrimination.

\* \* \*

An appropriate summary judgment in favor of DPS and against Bailey-Potts will be entered.

DONE, this the 21st day of February, 2012.

                              /s/ Myron H. Thompson
                          UNITED STATES DISTRICT JUDGE